Filed 8/30/21

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| BONNIE WOLSTONCROFT et al., | C091399 |
| Plaintiffs and Appellants, | (Super. Ct. No. CVPT-18-1854) |
| v. | |
| COUNTY OF YOLO, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Yolo County, Peter M. Williams, Judge. Affirmed.

Benink & Slavens and Eric J. Benink for Plaintiffs and Appellants.

Philip J. Pogledich, County Counsel, and Eric May, Senior Deputy County Counsel; Colantuono, Highsmith & Whatley, Michael G. Colantuono and John Lorenzo Jones II for Defendant and Respondent.

1

This reverse validation action was brought by Bonnie Wolstoncroft, William C. Unkel, and Michael Wilkes (collectively petitioners) against the County of Yolo (County)[1] to challenge the County's plan to continue water service to 95 residences within the North Davis Meadows County Service Area (County Service Area) by replacing two aging groundwater wells with the City of Davis's (City) water supply. Under this plan, North Davis Meadows residents would pay substantially higher water rates to pay for the project. The County considered the increased water rates to be property-related fees and noticed a Proposition 218 (as approved by voters, Gen. Elec. (Nov. 5, 1996)) hearing.

Under Proposition 218, different procedural requirements apply depending on whether the levy is an assessment or property-related fee. (Compare Cal. Const., art. XIII D, § 4 [assessments] with § 6 [property-related fees].)[2] Assessments require majority *approval* of property owners while property-related fees can be defeated by majority *protest* of property owners. (*Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 215 (*Bighorn*).) After conducting a public hearing, the Board of Supervisors adopted resolution No. 18-28 to approve an increase in water service fees to fund the project to extend the water service from the City's water supply to North Davis Meadows. The parties subsequently executed two tolling agreements to extend the deadline for petitioners to file a reverse validation action.

More than five months after the County adopted its resolution, but before the deadline contemplated by the parties' tolling agreement, petitioners filed their action in

---

[1] Under Government Code section 25210.2, subdivision (a), "the county board of supervisors acting as the governing authority of a county service area." For convenience, we refer to the governing board of the county service area in this case as the Board of Supervisors and the defendant in this action as the County.

[2] Unspecified references to "article" refer to articles of the California Constitution.

superior court. The trial court rejected petitioners' argument that the increased levy constituted an assessment for which majority approval is required by Proposition 218. The trial court also rejected petitioners' contentions that the County wrongfully rejected protest votes it claimed not to have received or received in an untimely manner.

On appeal, petitioners contend (1) the levy constitutes an assessment under Proposition 218 because it is not a property-related fee, (2) even if a property-related fee, the exaction still violates article XIII D, section 6, subdivision (b)(4), because it does not provide water service that is "immediately available," and (3) the trial court erroneously refused to consider evidence of three valid protests. On our own motion, we directed the parties to address the issue of whether this case must be dismissed for lack of jurisdiction because the action was filed by petitioners more than 60 days after the Board of Supervisors adopted the resolution to approve the increased water service fee. (See Code Civ. Proc., § 863; Gov. Code, § 25210.6.)

We have received and considered supplemental letter briefs from petitioners and the County. We conclude that petitioners timely filed their reverse validation action in compliance with the parties' tolling agreements. On the merits of petitioners' claims, we conclude that the trial court correctly determined that the levy constitutes a property-related fee under Proposition 218. The fee authorized by resolution No. 18-28 provides existing customers with continued water service. The fact that maintaining adequate water supply requires switching water sources does not turn the fee into an assessment. Thus, the County properly employed the majority protest procedure under article XIII D, section 6. We further conclude that even if the trial court erred in denying petitioners' motion to augment the record with declarations regarding two mailed protest votes, petitioners' evidence would not prove timely compliance with the protest procedure. Without the protest votes for which only evidence of mailing was tendered, the protest lacked a majority. Accordingly, we affirm the judgment.

3

# BACKGROUND

## *North Davis Meadows Water Project*

North Davis Meadows draws upon two water wells that are approaching the end of their estimated useful lives. Well No. 1 relies on electrical equipment and controls that need to be replaced, and the well draws sand. In 2009, the nitrate level in well No. 1 water exceeded the maximum contaminate level and required users to be notified of the unsafe water condition. In 2016, the water drawn from well No. 2 was subject to a compliance order due to excessive nitrate, aluminum, and iron levels. Well No. 2 – like the other well – has "issues with subsidence." These water wells serve 95 residences within North Davis Meadows, an unincorporated subdivision in the County.

Since 2010, the County has been working to address the water quality and supply problems relating to its two wells. Numerous discussions between the County, City, and North Davis Meadows residents have explored consolidating North Davis Meadows with the City's water supply. Alternate proposals such as drilling new wells and a "dual-connection system" including existing wells and City water have been explored. In 2014, the City joined with the City of Woodland and UC Davis to create a surface water supply project that significantly changed the City's water supply. North Davis Meadows was not included in the surface water project. In 2015, North Davis Meadows residents expressed a preference for a dual-connection system. A dual-connection system, however, did not appear sufficient to meet North Davis Meadows's fire protection needs.

A 2017 survey of North Davis Meadows residents found that the option of connecting to the City's supply for all of the County Service Area's water had been gaining support. The County amended its agreement with its engineering consultant to pursue this option and noticed a Proposition 218 hearing on increasing water rates to fund the project. The engineer's report estimated the cost of consolidation with the City's water supply at $8.25 million. The project was anticipated to increase the annual water

4

bill for each North Davis Meadows resident from $2,118 to $6,021.  Even so, the plan to rely entirely on the City's water supply appeared to be the least expensive of the options considered.

### *The Ratemaking Hearing*

In early 2018, notice of a Proposition 218 hearing was mailed to all North Davis Meadows property owners.  On March 20, 2018, the Board of Supervisors held a public hearing on the proposal to connect North Davis Meadows to the City's water supply.  Prior to the public hearing, the County received 46 protest votes – two protest votes fewer than required to block the fee under California Constitution article XIII D, section 6, subdivision (a)(2).  During the public portion of the hearing, members of the public commented on the project.  One additional protest vote was received after the close of the public portion of the hearing and deemed untimely.  In the absence of sufficient protest votes to block the project, the Board of Supervisors adopted resolution No. 18-28 to approve the property-related water service fee.

### *The Reverse Validation Action*

On October 4, 2018, petitioners filed a petition for writ of mandate and complaint for reverse validation (Code Civ. Proc., § 863) and declaratory relief.  The County opposed the petition and complaint.  A bench trial culminated in a judgment for the County.  The trial court stated its reasons as follows:

"1.  The water fees are not taxes under California Constitution, article XIII C, section 1[ subdivision ](e).  The fees are being imposed upon each parcel as an incident of property ownership.  (Cal. Const., article XIII D, § 2; *Richmond v. Shasta Community Services Dist*. (2004) 32 Cal.4th 409, 427.)

"2.  [The County] has complied with the procedural requirements of California Constitution, article XIII D, section 6[ subdivision ](a).  [The County's] notice included the amount of the fee proposed to be imposed upon each identified parcel and the basis

5

upon which the amount of the proposed fee was calculated. [Citation.] [The County] properly declined to count protests never received, or delivered after the public hearing. (Cal. Const., article XIII D, § 6, subd. (a)(2); [citation].)

"3.     [The County] has complied with the substantive requirements of California Constitution, article XIII D, section 6[ subdivision ](b). The fees fund services immediately available to the property owners in question. (*Capistrano Taxpayers Assn., Inc. v. City of San Juan Capistrano* (2015) 235 Cal.App.4th 1493, 1497 ['*Capistrano*'].) [The County] has sufficiently shown that the fees are proportional to the cost of services attributable to the parcel. (*Griffith v. Pajaro Valley Water Management Agency* (2013) 220 Cal.App.4th 586, 601; cf. *Capistrano, supra*, 235 Cal.App.4th at p. 1497 [find that the City 'had to correlate its tiered prices with the actual cost of providing water at those tiered levels.'].)"

The trial court entered judgment on January 16, 2020, and petitioners filed a timely notice of appeal.

## DISCUSSION

### I

### *Timeliness of the Reverse Validation Action*

In response to our request for supplemental briefs, petitioners argue that their action was timely under tolling agreements signed by the parties. The County agrees that the parties intended to toll the filing deadline for the reverse validation action but notes that we must nonetheless address the issue of jurisdiction. We conclude that the reverse validation statutes are subject to a statute of limitations that may be extended by agreement of the parties.

6

## A.

### *The Parties' Tolling Agreements and Petitioners' Action*

After the County adopted resolution No. 18-28 on March 20, 2018, the parties entered into a tolling agreement on May 8, 2018.  In the recital, the parties stated that the tolling agreement was motivated in part by the fact that they were still "engaged in a dialogue about the water fee increases and possible alternatives for addressing water-related health and safety issues" so that they "believe[d] that it [was] in the public interest to delay the filing of any lawsuit to allow the parties to continue their dialogue."  On July 11, 2018, the parties executed a "first amendment" to their tolling agreement that extended the deadline for filing a reverse validation action beginning on May 8, 2018, and ending on September 30, 2018.  Petitioners filed their reverse validation action on October 4, 2018 – more than five months after the County adopted resolution No. 18-28 on March 20, 2018.

## B.

### *Reverse Validation Actions*

Code of Civil Procedure sections 860 through 870 provide for validation actions. Validation actions " 'provide an expedited process by which certain public agency actions may be determined valid and not subject to attack.' (*Kaatz* [*v. City of Seaside* (2006)] 143 Cal.App.4th [13,] 19, fn. omitted; see generally *City of Ontario v. Superior Court* (1970) 2 Cal.3d 335, 340-342 (*City of Ontario*); *Kaatz*, at pp. 29-31.)  The validation statutes apply to a matter when 'any other law' authorizes their application, and the statutes provide for *a 60-day period* during which an action may be brought to 'determine the validity of such matter.' ([Code Civ. Proc.,] § 860; see *Kaatz*, at p. 31.)" (*Golden Gate Hill Development Co., Inc. v. County of Alameda* (2015) 242 Cal.App.4th 760, 765-766, italics added, fn. omitted (*Golden Gate*).)

7

When a public agency does not bring a validation action and an interested person challenges the validity of the governmental act, the lawsuit is called a reverse validation action.  (Code Civ. Proc., § 863; see generally *McLeod v. Vista Unified School Dist.* (2008) 158 Cal.App.4th 1156, 1166 (*McLeod*).)  To this end, Code of Civil Procedure section 863 provides:  "If no proceedings have been brought by the public agency pursuant to this chapter, any interested person may bring an action within the time and in the court specified by Section 860 to determine the validity of such matter.  The public agency shall be a defendant and shall be served with the summons and complaint in the action in the manner provided by law for the service of a summons in a civil action.  In any such action the summons shall be in the form prescribed in Section 861.1 except that in addition to being directed to 'all persons interested in the matter of [specifying the matter],' it shall also be directed to the public agency.  If the interested person bringing such action fails to complete the publication and such other notice as may be prescribed by the court in accordance with Section 861 and to file proof thereof in the action within 60 days from the filing of his complaint, the action shall be forthwith dismissed on the motion of the public agency *unless good cause for such failure is shown by the interested person.*"  (Original brackets, italics added.)

Failure to bring a reverse validation action within the 60-day deadline allows the action to be dismissed on a motion of the public agency.  (Code Civ. Proc., § 863.)  "If no action is brought within the 60-day timeframe, the public is 'forever barred afrom contesting the validity of the agency's action in a court of law.' "  (*Golden Gate, supra*, 242 Cal.App.4th at p. 766, quoting *City of Ontario v. Superior Court* (1970) 2 Cal.3d 335, 341 (*City of Ontario*); see also Gov. Code, § 25210.6, subd. (c)(1) [borrowing the 60-day deadline of Code of Civ. Proc., § 860 for an action to challenge a resolution levying an assessment, charge, or fee].)  Code of Civil Procedure section 870, subdivision (a), confirms that a validation judgment is "forever binding and conclusive, as to all matters therein adjudicated or which at that time could have been adjudicated, against the

8

agency and against all other persons, and the judgment shall permanently enjoin the institution by any person of any action or proceeding raising any issue as to which the judgment is binding and conclusive."  The 60-day deadline imposed by the validation statutes "further the important policy of speedy determination of the public agency's action.  (Code Civ. Proc., § 863; *Millbrae School Dist. v. Superior Court* (1989) 209 Cal.App.3d 1494, 1497; see also *Planning & Conservation League v. Department of Water Resources* (1998) 17 Cal.4th 264, 273 ['allowing a longer period for appeal in validation actions from collateral orders than from judgments would be anomalous and confusing, and thus inconsistent with the legislative purpose of ensuring prompt finality in such actions'].)"  (*Embarcadero Mun. Improvement Dist. v. County of Santa Barbara* (2001) 88 Cal.App.4th 781, 790.)

## C.

### *Tolling by Agreement*

Petitioners' reverse validation action was timely filed *if* the statute of limitations to file a reverse validation action may be equitably tolled by agreement of the parties.  (See *McLeod, supra,* 158 Cal.App.4th at p. 1164 [referring to the time limit as a "statute of limitations"]; *Embarcadero Mun. Improvement Dist. v. County of Santa Barbara, supra*, 88 Cal.App.4th at p. 784 [same].)  On the topic of equitable tolling, the California Supreme Court has recently explained that it "is a 'judicially created, nonstatutory doctrine' that ' "suspend[s] or extend[s] a statute of limitations as necessary to ensure fundamental practicality and fairness." ' (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 99 (*McDonald*).)  The doctrine applies 'occasionally and in special situations' to 'soften the harsh impact of technical rules which might otherwise prevent a good faith litigant from having a day in court.' (*Addison v. State of California* (1978) 21 Cal.3d 313, 316 (*Addison*).)  Courts draw authority to toll a filing deadline from their inherent equitable powers – not from what the Legislature has

declared in any particular statute.  (See *Elkins v. Derby* (1974) 12 Cal.3d 410, 420, fn. 9 (*Elkins*).)  For that reason, we presume that statutory deadlines are subject to equitable tolling.  (See *Irwin v. Department of Veterans Affairs* (1990) 498 U.S. 89, 95-96 [112 L.Ed.2d 435] (*Irwin*).)"  (*Saint Francis Memorial Hospital v. State Dept. of Public Health* (2020) 9 Cal.5th 710, 719-720 (*Saint Francis*).)

The presumption in favor of equitable tolling's application to statutory deadlines, however, "can be overcome.  Equitable tolling, [the supreme court has] also observed, 'is not immune' from the operation of statutes.  (*McDonald, supra*, 45 Cal.4th at p. 105.)  A court may conclude that explicit statutory language or a manifest policy underlying a statute simply cannot be reconciled with permitting equitable tolling, 'even in the absence of an explicit prohibition.'  (*Ibid*.)"  (*Saint Francis, supra,* 9 Cal.5th at p. 720.)  Thus, the question of whether equitable tolling applies to a statutory deadline "begins with the statute's language and structure."  (*Ibid.*)  A proper analysis then considers whether the length of the statute of limitations demonstrates "a legislative purpose to forbid the availability of equitable tolling."  (*Ibid*.)  Thus, "[a] 10-year statute of limitations . . . is 'so "exceptionally long" ' that it 'indicates the Legislature's effort to provide, within the strict statutory period itself, a reasonable time to' file suit.  (*Lantzy* [*v. Centex Homes* (2003)] 31 Cal.4th [363,] 379.)  But [a] 30-day limitations period is relatively brief, so it carries with it no such inference."  (*Ibid*.)  "A requirement that parties seek judicial review within 30 days . . . doesn't prohibit courts' exercise of their equitable powers to toll that limitations period when justice so requires."  (*Id.* at p. 721.)  Even so, the California Supreme Court cautioned that when a court reaches "the conclusion that the Legislature hasn't prohibited a statute of limitations from being tolled ought not transform equitable tolling into 'a cure-all for an entirely common state of affairs.' (*Wallace v. Kato* (2007) 549 U.S. 384, 396 [166 L.Ed.2d 973] (*Wallace*).)  Courts must instead carefully examine the facts of each case to determine whether 'justice and

fairness' demand that the limitations period be tolled." (*Id.* at p. 724, quoting *Lambert v. Commonwealth Land Title Ins. Co*. (1991) 53 Cal.3d 1072, 1081.)

For our purposes, we draw on an illustrative case decided in the context of California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), where parties have only 30 days to file a complaint to challenge the sufficiency of an environmental impact report (EIR). (*Salmon Protection & Watershed Network v. County of Marin* (2012) 205 Cal.App.4th 195, 201 (*Salmon Protection*); Pub. Resource Code, § 21167, subd. (b).) As the *Salmon Protection* court noted about the 30-day deadline, "there is a strong public policy, recognized in numerous decisions, favoring the prompt disposition of CEQA challenges." (*Salmon Protection*, at p. 201.) The *Salmon Protection* court further noted that "[t]here is an equally strong public policy . . . recognized in just as many cases, to encourage the settlement of controversies in preference to litigation. Our Supreme Court 'recognized a century ago that settlement agreements " 'are highly favored as productive of peace and good will in the community,' " as well as " 'reducing the expense and persistency of litigation.' " [Citation.] The need for settlements is greater than ever before. "Without them our system of civil adjudication would quickly break down." ' (*Neary v. Regents of University of California* (1992) 3 Cal.4th 273, 277; see also, e.g., *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc*. (1986) 42 Cal.3d 1157, 1166, ['Settlements of disputes have long been favored by the courts . . . .'].)" (*Ibid*.)

In light of the public policy encouraging settlements and the short 30-day deadline in that case, the *Salmon Protection* court upheld the validity of a series of tolling agreements between parties to extend the deadline to file a challenge to the EIR. (*Salmon Protection*, *supra*, 205 Cal.App.4th at p. 199.) *Salmon Protection* explains: "If all parties directly involved in a controversy concerning the adequacy of an EIR or compliance with other provisions of CEQA are disposed to seek a mutually acceptable means of resolving the controversy and agree to toll the period for commencing litigation,

11

the interests of both those parties and the public are promoted by permitting the settlement discussions to proceed without the distraction of litigation. If those challenging compliance with CEQA must file suit within the short 30–day deadline or lose their right to do so, time and effort that otherwise could be devoted to the search for common ground would be devoted to the demands of litigation—from preparing the pleadings to complying with the accelerated schedule required of CEQA litigation. The parties would be required to devote themselves and their resources to sharpening their disagreement rather than to resolving it. Too often this would be unnecessarily time-consuming and costly to all concerned, and would severely limit efforts to resolve differences in a mutually acceptable manner." (*Id.* at p. 202.)

## D.

### *Analysis*

We conclude that the tolling agreements in this case extended the deadline to file the petitioners' reverse validation action. During the tolling period, petitioners and County representatives communicated about the project and ways that consensus might be forged on a new and different approach to solving the North Davis Meadows water supply issues. Residents within North Davis Meadows extensively discussed the issues among themselves in search of a solution. Petitioners attempted to sway the Board of Supervisors with a new engineering report that provided new cost estimates for deep water supply wells that might be drilled. County staff too was involved in the dialog about possible solutions. As a result, the Board of Supervisors considered the petitioners' suggestions at one of its meetings.

Although the Board of Supervisors ultimately decided not to change course from resolution No. 18-28, the efforts at dialog appear to represent concerted efforts by all parties to resolve the matter without litigation. The record strongly suggests that the extensive nature of the communications between stakeholders in this county service area

12

would not have been possible if the 60-day deadline to file a reverse validation action required strict enforcement. As with the 30-day deadline in *Salmon Protection*, precluding tolling agreements would have the effect of precluding parties from devoting their energies fully to exploring mutually acceptable solutions. (*Salmon Protection*, *supra*, 205 Cal.App.4th at p. 202.) Strict enforcement of a 60-day deadline would likely have required channeling much of the effort toward settlement into preparation for litigation. (*Ibid.*)

We do not discern an intent of the Legislature to preclude tolling of the 60-day deadline imposed by Code of Civil Procedure section 863. The statute does not contain language barring extension of its deadline. To the contrary, section 863 excuses the requirement that reverse validation plaintiffs file proof of that summons directed to the public agency and interested parties was published when good cause for such failure is demonstrated. (*City of Ontario, supra*, 2 Cal.3d 335, 345-346.) Thus, section 863 recognizes that the short deadline to file a reverse validation action precludes strict enforcement. (See *City of Ontario,* at p. 345 [calling the 60-day validation statute deadline "brief"].) We conclude Code of Civil Procedure section 863 constitutes a statute of limitations that is subject to equitable tolling by express agreement of the parties.

## II

### *Proposition 218 Challenge*

Petitioners contend the levy imposed by resolution No. 18-28 constitutes an assessment under Proposition 218 that required majority approval of property owners. We disagree and conclude that resolution No. 18-28 imposed a property-related fee.

### A.

### *Review*

We review the question of whether the levy imposed by resolution No. 18-28 constitutes a property-related fee under the independent standard of review. "Whether an

13

exaction is a property-related charge for purposes of article XIII D 'is a question of law for the appellate courts to decide on independent review of the facts.' (*Sinclair Paint* [*Co. v. State Bd. of Equalization* (1997)] 15 Cal.4th [866,] 874.) We construe the provisions of article XIII D liberally, ' "to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent." ' (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 448.) The relevant government agency . . . bears the burden of demonstrating compliance. (Cal. Const., art. XIII D, § 6, subd. (b)(5).)" (*City of San Buenaventura v. United Water Conservation Dist.* (2017) 3 Cal.5th 1191, 1204 (*San Buenaventura*).) Whether an exaction is a property-related charge for purposes of article XIII D "is a question of law for the appellate courts to decide on independent review of the facts." (*Sinclair Paint Co. v. State Bd. of Equalization, supra*, 15 Cal.4th at p. 874.)

**B.**

### *The Exaction Imposed by Resolution No. 18-28*

Before the County adopted resolution No. 18-28, North Davis Meadows residents were receiving water through their connections to the County Service Area water supply. During the fiscal year in which resolution No. 18-28 was passed, North Davis Meadows residents were charged a $2,118 total residential water fee consisting of $1,262 for water, landscape, lighting, and storm drain service, $188 for water quality and administration, $295 for utility recovery, $75 for asset replacement reserve, and $298 for residential loan repayment fee. The County projected that the components of the residential water fee would remain almost exactly the same even after adoption of resolution No. 18-28, except for a change in the residential loan repayment fee. The residential loan repayment fee would increase from $298 to $4,157. This increase was intended to pay for installation of individual water meters at every nonvacant parcel within the County Service Area as well as connect to the City water system.

14

In noticing the Proposition 218 hearing, the County recounted that "[a] fee to repay a State Revolving Fund (SRF) water project planning loan from State Water Resources Control Board was put in place in 2016.  The County has since identified a more favorable loan that will consolidate the planning and construction costs over a longer repayment period, thereby making the project more cost effective.  The fee assessed in 2016 will be discontinued and the money already collected will be applied towards the consolidated loan to reduce the amount of the loan.  The higher rate now being considered is necessary to repay the consolidated loan."  The County also noted, "The total proposed water fee is expected to decrease once [North Davis Meadows] wells are decommissioned."

## C.

### *Ongoing Water Delivery*

The California Supreme Court has explained that " 'subdivision (c) of article XIII D, section 6, . . . expressly excludes "fees or charges for sewer, water, and refuse collection services' from the voter approval requirements that article XIII D imposes on property-related fees and charges." ' " (*Bighorn, supra,* 39 Cal.4th at p. 215.)  Consequently, " 'a water service fee is a fee or charge under article XIII D if, but only if, it is imposed "upon a person *as an incident of property ownership*." (Art. XIII D, § 2, subd. (e).)' (*Richmond* [*v. Shasta Community Services Dist.*]*, supra,* 32 Cal.4th at pp. 426-427.)  [¶]  For purposes of identifying fees and charges under California Constitution article XIII D, [the *Richmond* court] drew a distinction between water service connection charges and charges for ongoing water delivery.  [*Richmond*] explained:  'A fee for ongoing water service through an existing connection is imposed "as an incident of property ownership" because it requires nothing other than normal ownership and use of property.  But a fee for making a new connection to the system is not imposed "as an incident of property ownership" because it results from the owner's voluntary decision to

15

apply for the connection.' (*Richmond* [*v. Shasta Community Services Dist.*]*, supra*, 32 Cal.4th at p. 427.)" (*Bighorn, supra*, 39 Cal.4th at p. 215, italics added.)

In a nutshell, "a public water agency's charges for *ongoing water delivery . . .* are fees and charges within the meaning of article XIII D . . . ." (*Bighorn, supra*, 39 Cal.4th at p. 216, italics added.) Even so, Proposition 218 provides that "the amount of a governmental imposed fee ' "shall not exceed the proportional cost of the service attributable to the parcel." ' " (*Malott v. Summerland Sanitary Dist.* (2020) 55 Cal.App.5th 1102, 1108, quoting *Plantier v. Ramona Municipal Water Dist*. (2019) 7 Cal.5th 372, 382, italics omitted.)

D.

*North Davis Meadows Water Service*

The levy imposed by the County's adoption of resolution No. 18-28 does not constitute an assessment for which prior majority approval is required. Of the five components making up the water service fee for North Davis Meadows residents, four remained essentially unchanged by the resolution. The fifth component – representing the residential loan repayment fee – was not a new levy. Instead, the residential loan repayment fee was continued by the resolution, albeit at a substantially higher rate.

Most importantly for Proposition 218 purposes, the entire water rate plan adopted by resolution No. 18-28 was intended to facilitate *ongoing* water delivery to North Davis Meadows residents. Petitioners were receiving water through the County Service Area and would continue to receive water through the County Service Area as a result of resolution No. 18-28, which was intended to assure sufficient safe water to North Davis Meadows residents. Because the increased water fee reflected the increased cost of continued water service, it represents a charge for ongoing water delivery that is a property-related fee within the meaning of Proposition 218. Thus, the County was not

16

required to follow the procedure required for assessments when it adopted resolution No. 18-28.

We reject petitioners' contention that the increased water service fee was an assessment because the *source* of the water to be supplied would come from the City rather than the two wells within the County Service Area. Petitioners' water will be delivered using the existing distribution pipes to connect to the City's water supply. Thus, resolution No. 18-28 represents a cost of service for ensuring continued water delivery that constitutes a fee rather than an assessment. (*Bighorn*, *supra*, 39 Cal.4th at p. 215; *Richmond v. Shasta Community Services Dist., supra*, 32 Cal.4th at p. 427 (*Richmond*).) Notably, petitioners offer no reasoning that can explain how a connection to the City's water supply has a different constitutional character under Proposition 218 than would petitioners' preferred alternative of a connection to a new deep well. We conclude that resolution No. 18-28 provided for ongoing water service to North Davis Meadows residents.

Nor does the change in water source mean that resolution No. 18-28 imposed a "standby" fee for which article XIII D, section 6, subdivision (b)(4) requires approval as an assessment. Standby fee refer to fees charged for "for making water available to property 'whether the water . . . services are actually used or not.' " (*Keller v. Chowchilla Water Dist.* (2000) 80 Cal.App.4th 1006, 1011, fn. 5, quoting Gov. Code, § 54984.2.) Here, the water service fee imposed on petitioners is for continued water service to their properties within the County Service Area. " '[O]nce a property owner . . . has become a customer of a public water agency, all charges for water *delivery* incurred thereafter are charges for a property-related service, whether the charge is calculated on the basis of consumption or is imposed as a fixed monthly fee.' " (*Paland v. Brooktrails Tonwship Community Services Dist. Bd. of Directors* (2009) 179 Cal.App.4th 1358, 1367-1368, quoting *Bighorn, supra*, 39 Cal.4th at p. 217.) As a fee

17

intended to ensure continued water service, the levy imposed by resolution No. 18-28 is not a standby fee under Proposition 218.

We are not persuaded by petitioners' reliance on *San Buenaventura, supra,* 3 Cal.5th 1191 to support their argument that petitioners "are essentially paying a connection charge" because "property owners have not yet connected to the City of Davis's system." In essence, petitioners argue that their ongoing connection to the County Service Area water service should be ignored for purposes of Proposition 218 analysis. We reject the argument.

*San Buenaventura* involved a challenge to a groundwater pumping charge on grounds that it was not a property-related fee within the meaning of article XIII D as enacted by Proposition 218. (*San Buenaventura, supra*, 3 Cal.5th at p. 1208.) The City of San Buenaventura argued that the groundwater pumping fee it paid to the local water conservation District was disproportionate to the benefits it received from the District's conservation efforts to recharge the groundwater aquifer. (*Id.* at p. 1197.) The salient fact in *San Buenaventura* was that a groundwater recharge does not " 'deliver' water 'via groundwater' to any particular parcel or set of parcels . . . ." (*Id.* at p. 1208.) Instead, a recharge "conserves and replenishes groundwater that flows through an interconnected series of underground basins, none of which corresponds with parcel boundaries." (*Ibid.*) "All this means that the District's services, by their nature, are not directed at any particular parcel or set of parcels in the same manner as, for example, water delivery or refuse collection services." (*Ibid.*) The *San Buenaventura* court concluded, "The lesson that emerges from the text and cases is this: A fee is charged for a 'property-related service,' and is thus subject to article XIII D, if it is imposed on a property owner, in his or her capacity as a property owner, to pay for the costs of providing a service *to a parcel of property*." (*Ibid.*) Consequently, a groundwater pumping charge was not a property-related fee. (*Ibid.*)

18

In contrast to *San Buenaventura*, here the levy charged to petitioners relates to water service provided to North Davis Meadows residents and *only* North Davis Meadows residents. Moreover, petitioners acknowledge that the purpose of resolution No. 18-28 is to fund a new water distribution project so the property owners can connect to the City's water supply. The project authorized by resolution No. 18-28 inures to the benefit of North Davis Meadows residents by ensuring continued water service to their properties.

Despite the difference in factual circumstance, we nonetheless draw instruction from *San Buenaventura, supra,* 3 Cal.5th 1191 on the question of whether petitioners in this case are receiving a "new connection" to water service that would require majority approval as an assessment. *San Buenaventura* explains that "a fee for making a new connection to the system is not imposed 'as an incident of property ownership' because it results from the owner's voluntary decision to apply for the connection.' (*Richmond, supra*, 32 Cal.4th at p. 427.) That conclusion . . . is reinforced by practical considerations: Because a local government agency cannot identify in advance which property owners will seek new connections to the water system, it has no practical means of complying with article XIII D's requirement that the agency 'identify the parcels on which the assessment will be imposed and provide an opportunity for a majority protest . . . .' " (*Id.* at p. 1205, quoting *Richmond, supra*, 32 Cal.4th at p. 419.) Here, the petitioners are already connected to the water system for North Davis Meadows. This is not a case in which the water rate increase will be borne by property owners who cannot yet be identified. Instead, North Davis Meadows residents were identified and all given an opportunity to protest. Neither the rule nor the rationale applicable to assessments based on future connections to water service applies in this case.

19

# III

## *Number of Valid Protest Votes*

Petitioners argue that the trial court erred in refusing to consider two declarations by North Davis Meadows residents stating that they mailed their protest vote before the Proposition 218 hearing.  Petitioners further argue that the trial court should have counted as a valid protest vote the vote submitted at the Proposition 218 hearing but after the close of the public portion of the hearing.  We conclude that, even if the trial court had considered the two declarations, the declarations do not establish properly received protest votes.  Without these two votes, there would not have been a majority.

## A.

### *Review*

As a fundamental principle of appellate review, we begin with the presumption that the trial court's judgment or order is correct.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)  Consistent with this presumption, " '[a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.  This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Ibid.*, quoting 3 Witkin, Cal. Procedure (1954) Appeal, § 79, pp. 2238-2239.)  "Moreover, we will affirm a judgment correct on any legal basis, even if that basis was not invoked by the trial court.  (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32.)  There can be no prejudicial error from erroneous logic or reasoning if the decision itself is correct." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 269.)

## B.

### *Petitioners' Motion to Augment the Administrative Record in the Trial Court*

The parties agree that 48 timely, written protest votes would have constituted a majority protest for the 95 residential properties within the County Service Area that

would have prevented the County from imposing the fee in resolution No. 18-28. The administrative record prepared by the County shows it received only 46 protest votes. Included in the administrative record is a copy of every protest vote received by the County. No protest vote forms from Cammarosano and Shin-Lee are included. The record also includes a tally of list of every North Davis Meadows resident along with a notation of whether that resident filed a protest vote. There is no notation of a protest by Cammarosano or Shin-Lee.

All but one of the protest vote forms received by the County bear a stamp noting the date on which the protest vote was *received* by the clerk of the Board of Supervisors. The one form lacking a stamp indicating receipt shows that it was submitted by James Faulkner but marked as filed "after [public hearing] closed – invalid." The County gave notice of certification of the administrative record on July 22, 2019. On July 15, 2019, petitioners moved to augment the administrative record. With the motion to augment, petitioners sought to introduce declarations by Carmine Cammarosano and John Shin-Lee.

Cammarosano declared that he had "filled out" a " 'Water Fee Increase Protest Form' " opposing the proposed water fee increase, "put a first class stamp on the envelope" addressed to the clerk of the Board of Supervisors, and "[o]n approximately March 12, 2018, . . . put this stamped and addressed envelope in an outgoing mail receptacle at [his] place of business" in Woodland. Cammarosano further declared, "This should have been plenty of time to arrive by the hearing." Shin-Lee similarly declared that he filled out the protest form, put a " '[f]orever' " postage stamp on the envelope, and "[o]n March 12th, 2018, . . . placed the envelope in the mail at Post Office located on Royal Oaks Drive, Sacramento, CA. 95815."

Following the adoption of resolution No. 18-28, a County supervisor wrote a letter to North Davis Meadows residents summarizing the County's efforts to ensure continuing water service within the County Service Area. The letter, which is included in

21

the administrative record, notes: "Following the close of the public hearing, and the tabulation of the protests with an observer from the community present, the Clerk of the Board confirmed that 46 valid protests were received, thus the protest did not reach the 48 majority protest threshold." The administrative record also contains copy of every protest vote received the County – whether deemed valid, in duplicate, or late. The County denied receiving a protest vote from either Cammarosano or Shin-Lee.

The trial court denied petitioners' motion to augment the record with the Cammarosano and Shin-Lee declarations. In denying the motion, the trial court explained: "Petitioners have failed to provide sufficient legal authority to overcome the well-recognized rule, which limits the Court's review to the administrative record. (*San Joaquin County Local Agency Formation Commission v. Superior Court* (2008) 162 Cal.App.4th 159, 167; *Western States Petroleum Ass'n v. Superior Court* (1995) 9 Cal.[4]th 559, 574.) Moreover, petitioners have not shown that the identified documents, in their request to augment, fall into any recognized exception allowing the Court to admit such documents. (*Outfitter Properties, LLC v. Wildlife Conservation Bd*. (2012) 207 Cal.App.4th 237, 251.)"

Regarding the number of protest protests submitted in opposition to resolution No. 18-28, the trial court found that the County "has complied with the procedural requirements of California Constitution, article XIII D, section 6[ subdivision ](a). [The County's] notice included the amount of the fee proposed to be imposed upon each identified parcel and the basis upon which the amount of the proposed fee was calculated. [Citation.] [The County] properly declined to count protests never received, or delivered after the public hearing. (Cal. Const., article XIII D, § 6, subd. (a)(2) . . . .)"

## C.

### *Receipt of Protest Votes*

The California Supreme Court has explained that "[a]n agency seeking to impose or increase a property-related fee must hold a hearing and send written notice of the hearing to the owner of each affected parcel. (Art. XIII D, § 6, subd. (a)(1).) The notice must specify the amount of the proposed fee, the basis of calculation, and the reason for the fee. It must note the date, time, and location of the public hearing. (*Ibid*.) At that hearing, 'the agency shall consider all protests against the proposed fee or charge.' (*Id*., § 6, subd. (a)(2) . . . .) In addition to mandating that the agency 'consider' all protests, Proposition 218 establishes a majority protest remedy. 'If written protests against the proposed fee or charge are presented by a majority of owners of the identified parcels, the agency shall not impose the fee or charge.' (*Ibid*.)" (*Plantier v. Ramona Municipal Water Dist., supra*, 7 Cal.5th at p. 381, italics omitted.)

We note that the County expressly admonished residents on their ballot forms that their votes had to be *received* by the County's clerk as follows: "All written protests must be received by the Clerk of the Board of Supervisors, 625 Court Street, Room 204, Woodland, CA 95695, before the close of the public hearing, which is scheduled for **Tuesday, March 20, 2018 at 9:00 a.m.** in the Board of Supervisors Chambers located in the County Administration Building at 625 Court Street, Room 206 in Woodland. Protests will be tabulated following the close of the public hearing." Under this procedure, the Clerk of the Board of Supervisors did not count protest votes from Cammarosano or Shin-Lee. The record supports the inference that the County never received protest votes from either Cammarosano or Shin-Lee. The administrative record does not include their protest forms even though it contains forms received in duplicate and the form received after the public testimony portion of the hearing on resolution No. 18-28.

We presume that the clerk of the Board of Supervisors properly carried out the task of gathering and counting protest votes. (*Consumer Watchdog v. Department of Managed Health Care* (2014) 225 Cal.App.4th 862, 883 (*Consumer Watchdog*).) Consequently, petitioners must overcome this presumption with evidence showing a majority of residents in the North Davis Meadows area submitted protest forms that were *received* at the right place and *received* at the right time. (Gov. Code, § 53753, subd. (c).) To this end, petitioners argue that the trial court erred in refusing the augment the administrative record with the declarations by Cammarosano and Shin-Lee. The County counters that the trial court correctly denied the motion to augment under *Western States Petroleum Ass'n v. Superior Court*, *supra,* 9 Cal.4th 559. We do not need to resolve whether the trial court erred in applying *Western States* because the declarations do not establish that valid protest votes were received from Cammarosano and Shin-Lee.

Neither the declaration by Cammarosano nor that by Shin-Lee show that their protest votes were received at the County's mailing address or received before the Proposition 218 hearing. Instead, Cammarosano and Shin-Lee declared only that they mailed their protest vote forms by first class postal mail. Neither offered any proof that the County ever received their forms.

We are not persuaded by petitioners' attempt to establish proper receipt of Cammarosano and Shin-Lee's vote by resorting to the presumption of Evidence Code section 641. Evidence Code section 641 provides: "A letter correctly addressed and properly mailed is presumed to have been received in the ordinary course of mail." For two reasons, this presumption is insufficient to help petitioners. First, the presumption does not provide any guidance as to *when* a letter will be deemed to have arrived. However, petitioners need to establish that the County at least received their letters containing their protest votes.

24

Second, the presumption is rebutted by evidence supporting denial of receipt. (*Slater v. Kehoe* (1974) 38 Cal.App.3d 819, 832, fn. 12, *Craig v. Brown & Root, Inc.* (2000) 84 Cal.App.4th 416, 421-422.)  Here, the County denied ever receiving protest votes from Cammarosano and Shin-Lee.  Moreover, the County showed that it counted protest votes with the help of an observer drawn from the community.  And, the County gathered and produced every protest vote received even if the County found the protest vote to be invalid due to being a duplicate or late.  Thus, the County's denial and evidence disproving receipt of any protest votes from Cammarosano and Shin-Lee rebutted the presumption of receipt.

We conclude petitioners' have not met their burden to show that the County received Cammarosano and Shin-Lee's protest votes on time, or even that the County received the protest vote forms at all.[3]  Accordingly, we reject petitioners' argument regarding the denial of their motion to augment the record in the trial court.

---

[3]     Our conclusion that the Cammarosano and Shin-Lee declarations did not establish proper receipt of their protest votes obviates the need to consider petitioners' argument that the County erred in refusing to consider the Faulkner protest on grounds that it was not timely submitted.  The addition of the Faulkner protest vote would not constitute a majority.

## DISPOSITION

The judgment is affirmed.  In the interests of justice, each party shall bear its own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (5).)


                                                    /s/
                                                    HOCH, J.


We concur:


 /s/
RAYE, P. J.


 /s/
BLEASE, J.

26