Filed 5/30/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| ROBERT GLUCK et al.,<br><br>     Plaintiffs and Appellants,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>     Defendant and Respondent; | A170087<br><br>(City & County of San Francisco<br>Super. Ct. No. CGC-23-609954) |

San Francisco has a combined sewer system that collects and treats both wastewater and stormwater in the same network. (*City and County of San Francisco v. Environmental Protection Agency* (2025) 604 U.S. ___ [145 S.Ct. 704, 707] (*Environmental Protection Agency*) [detailing combined system]; *Edward Brown & Sons v. City and County of San Francisco* (1950) 36 Cal.2d 272, 274 (*Edward Brown & Sons*) [describing "combined storm and sanitary sewers"].)

In 1996, California voters approved Proposition 218, also known as the "Right to Vote on Taxes Act." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) text of Prop. 218, § 1, p. 108.) Proposition 218 added certain provisions to the California Constitution for property-related charges imposed by local government. (Ballot Pamp., § 4, pp. 108–109.) These provisions included (1) a voter approval requirement for the imposition or increase of property-related charges, except for "sewer, water, and refuse collection services," and (2) a proportionality requirement that property-related charges "shall not

1

exceed the proportional cost of the service attributable to the parcel." (Cal. Const., art. XIII D,[1] § 6, subds. (b)–(c) ("art. XIII D, sections 6(b)–(c)").)

Plaintiffs Robert Gluck and Adam Hertz filed this class action against defendant City and County of San Francisco (City) challenging the constitutionality of City's sewer charges related to one aspect of its combined sewer system: stormwater. The first three causes of action relied on the premise that stormwater services funded by the City's sewer charges were not "sewer" services covered by the exception to Proposition 218's voter approval requirement. The fourth cause of action alleged that City's charges failed Proposition 218's proportionality requirement because they recovered stormwater costs through sewer rates that were based only on wastewater cost factors. The fifth cause of action sought declaratory relief related to these alleged violations of Proposition 218. City demurred to the complaint, which the trial court sustained without leave to amend.

On appeal, plaintiffs argue their allegations should have survived City's demurrer. We affirm the judgment as to plaintiffs' first three causes of action, concluding City's combined sewer system provides "sewer" services falling within the voter approval exception of article XIII D, section 6(c). But we reverse as to plaintiffs' fourth and fifth causes of action, concluding City did not establish that plaintiffs' allegations regarding City's sole reliance on wastewater factors to support charges recovering costs for stormwater services are insufficient as a matter of law to establish a violation of the proportionality requirement of article XIII D, section 6(b)(3).

---

[1] Further citations to "articles" refer to those in the California Constitution.

2

## FACTUAL AND PROCEDURAL BACKGROUND

### A. City's Combined Sewer System

San Francisco has a combined sewer system, which collects and treats wastewater and stormwater in the same network. (*Environmental Protection Agency*, *supra*, 145 S.Ct. at p. 707.) San Francisco is the only coastal city in California with a combined sewer system, which began over a century ago. To support development from the California Gold Rush in the 1850s, the system was designed to carry wastewater and stormwater flows to the shoreline. By 1899, over 300 miles of combined sewer lines had been completed. The city's master plan in 1935 led to the construction of the first treatment plants as well as additional sewer lines, creating a total collection system of approximately 900 miles.

Today, the San Francisco Public Utilities Commission (SFPUC) is the public agency that provides sewer services to the city. The combined wastewater and stormwater flows are carried by sewer pipes for treatment at one of SFPUC's treatment facilities. The final flows are then pumped for discharge to the San Francisco Bay and Pacific Ocean. This system can present challenges. During periods of heavy precipitation, for example, the combination of wastewater and stormwater flows may exceed system capacity and result in the discharge of untreated water. (*Environmental Protection Agency*, *supra*, 145 S.Ct. at p. 707.)

To operate, maintain, and finance this combined sewer system, SFPUC sets sewer rates charged to its users. In 2018, SFPUC conducted a cost-of-service study to determine "appropriate" sewer rates. Its resulting report explained, among other things, that costs attributable to certain "functional cost categories"—"primarily related to flow, strength, and customer service"— must be measured at the SFPUC facilities and estimated for each user.

3

These functional cost categories referenced costs incurred in treating wastewater: handling the volume of flows "discharged to or collected by the system"; removal and disposal of total suspended solids ("TSS") or non-filterable residue in wastewater; cleaning, treatment, and disposal of fats, oil, and grease ("FOG"); the chemical oxygen demand ("COD") of microbial organisms as they oxidize the organic matter present in wastewater; and customer service, such as accounting, billing, administrative, and technical support.

The 2018 report sought to provide a "rational basis" for distributing sewer costs to each customer class "in proportion to the demands they place on the systems." But because "explicit stormwater charge dollar values were challenging to identify for most agencies," the stormwater charges "were not isolated from wastewater charges in the rates table." Thus, the proposed rates for sewer charges reflected "combined sanitary sewer and stormwater sewer costs."

Five years later, SFPUC conducted a new study on sewer rates in order to "[d]evelop and introduce a stormwater charge to recover costs associated with wet weather flows and treatment." The ensuing 2023 report explained: "The SFPUC has historically recovered stormwater-related costs through wastewater rates. In this study, the stormwater-related portion of the sewer cost of service has been calculated to enable the split of the sewer rates into wastewater rates and stormwater charges." By splitting these costs, the report stated, "SFPUC will be able to enhance the equity in its rate structure by establishing a stormwater [charge] in addition to its wastewater rates."

The 2023 report described proposed sewer rates based on flow and strength factors. It then identified a new stormwater charge structure, with "Simplified" tiers for residential customers based on parcel size and the

4

average amount of permeable and impermeable area for parcels within each tier, and "Standard" rates for non-residential customers based on actual square footage of permeable and impermeable area. These rates were designed to recover $301,471,528 in wastewater service costs and $87,719,197 in stormwater service costs for fiscal year 2024. Because the proposed rate structure changes "would result in significant bill impacts on customers with parcels that have large impermeable surface areas," the 2023 report indicated such changes "should take place over a few years instead of all at once" given SFPUC's Ratepayer Assurance Policy principles of Affordability and Predictability.

## B. Plaintiffs' Complaint

In October 2023, plaintiffs filed a class action complaint alleging that, starting four months prior and continuing over a seven-year period, City is "phasing in" the new rate structure that separates stormwater charges from wastewater charges. That is, new stormwater rates would fund one-seventh of all stormwater costs beginning in July 2023, with the proportion increasing each year until the new rates completely fund stormwater costs in the seventh year. The complaint defines two prospective classes: (1) those who paid City sewer or stormwater charges from October 2022 to June 2023, and (2) those who paid City sewer or stormwater charges in or after July 2023.

The complaint includes five causes of action against City for purported violations of the constitutional requirements for property-related charges added by Proposition 218. The first cause of action alleges that City improperly implemented this new rate structure for stormwater service charges without submitting it for voter approval. (Art. XIII D, § 6(c).) The second, third, and fourth causes of action appear to target the stormwater charges City had imposed under the prior rate structure and is continuing to

5

impose while "phasing in" the new rate structure. The complaint describes City's "effort to eventually establish a proportionate stormwater rate" as "a step in the right direction," but alleges the California Constitution "does not permit an additional 7 years of delay."

The second and third causes of action allege that, by using sewer charges to fund stormwater services, City had derived revenue from charges that were excessive and used for an improper purpose. (Art. XIII D, § 6, subds. (b)(1)–(2).) The fourth cause of action alleges that City's charges were disproportionate because they were based on wastewater factors (e.g., flow and strength) but not stormwater factors (e.g., impermeable surface area). (Art. XIII D, § 6, subd. (b)(3).)

The complaint seeks to recover refunds for "illegal charges" resulting from City's alleged Proposition 218 violations. It also requests various forms of injunctive relief, as well as declaratory relief in a fifth cause of action, regarding City's imposition and collection of sewer and stormwater charges.

### C. City's Demurrer

City filed a demurrer to the complaint, arguing the first, second, and third causes of action failed because City's combined sewer system provides "sewer" services under the exception to Proposition 218's voter approval requirement. To support its interpretation of the term "sewer" in article XIII D, section 6(c), City cited Government Code section 53751.[2] Section 53751 was added by Senate Bill No. 231 in 2017 and states the term " 'sewer' should be interpreted to include services necessary to collect, treat, or dispose of sewage, industrial waste, or surface or storm waters, and any entity that

---

[2] Further undesignated statutory references are to the Government Code.

collects, treats, or disposes of any of these necessarily provides sewer service." (§ 53751, subd. (m); Stats. 2017, ch. 536, § 2.)

City then argued the fourth cause of action was "impermissibly uncertain" and did not allege facts showing the City's sewer rates either exceeded "the proportional cost of sewer services" or were unreasonable under article XIII D, section 6(b). Finally, City asserted the fifth cause of action for declaratory relief failed because it "depends entirely on allegations in the other causes of action."

Plaintiffs opposed the demurrer. As to their first three causes of action, they argued that City had misclassified stormwater charges as "sewer" charges and that City could not rely on Senate Bill No. 231 because it is unconstitutional. Plaintiffs also argued they had alleged sufficient facts in their fourth cause of action, stating: "No doubt discovery will be required in order to complete analysis of the City's disproportionate rate structure, but the fact that stormwater costs continue to be recovered through sewer rates, based on factors that are not relevant to the cost of managing storm drainage, is sufficient to state a claim under Proposition 218."

### D. Trial Court's Ruling

The trial court sustained the demurrer without leave to amend. In so ruling, the court concluded the first, second, and third causes of action failed because City's combined sewer system provides "sewer" services not subject to voter approval under Proposition 218. The court then found the fourth cause of action also failed because the linchpin of the claim was the same: that "wastewater and stormwater are distinct and stormwater management is not a 'sewer service.'" Then, having concluded all these "predicate claims" failed, the court sustained the demurrer to the fifth cause of action for

7

declaratory relief, also without leave to amend. Judgment was entered for City and against plaintiffs.

This appeal followed.

## DISCUSSION

Plaintiffs raise two principal issues in this appeal. First, they argue the trial court erred in sustaining the demurrer on their first three causes of action because the stormwater services provided as part of City's combined sewer system are not "sewer" services excepted from the voter approval requirement of article XIII D, section 6(c). Second, plaintiffs contend they should have been permitted to proceed beyond the pleading stage and/or given leave to amend their fourth cause of action on the proportionality requirement in article XIII D, section 6(b). We begin with an overview of the legal framework guiding our analysis: Proposition 218.

### A. Legal Framework

" 'Proposition 218 can best be understood against its historical background, which begins in 1978 with the adoption of Proposition 13.' " (*Apartment Ass'n of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 836 (*Apartment Ass'n*).) Proposition 13 amended the California Constitution by placing certain limitations on ad valorem property taxes (taxes based on assessed value) and increases in assessed valuations. (*Apartment Ass'n*, at p. 836.) " 'To prevent local governments from subverting its limitations, Proposition 13 also prohibited counties, cities, and special districts from enacting any special tax without a two-thirds vote of the electorate.' " (*Ibid*.) But subsequent case law held that a " 'special assessment' " was " 'not a special tax within the meaning of Proposition 13' " and thus " 'could be imposed without a two-thirds vote.' " (*Id*. at pp. 836–837.)

8

In 1996, California voters approved Proposition 218, known as the "Right to Vote on Taxes Act," which amended the state Constitution to override such case law. (Ballot Pamp., Gen. Elec., *supra*, text of Prop. 218, § 1, p. 108; see *Apartment Ass'n*, *supra*, 24 Cal.4th at p. 837.) As the ballot materials accompanying Proposition 218 explained: "Proposition 13 was intended to provide effective tax relief and to require voter approval of tax increases. However, local governments have subjected taxpayers to excessive tax, assessment, fee and charge increases that not only frustrate the purposes of voter approval for tax increases, but also threaten the economic security of all Californians and the California economy itself. This measure protects taxpayers by limiting the methods by which local governments exact revenue from taxpayers without their consent." (Ballot Pamp., § 2, p. 108.) Thus, as the "progeny" of Proposition 13, Proposition 218 " 'buttresses' " the constitutional limitations on ad valorem and special taxes " 'by placing analogous restrictions on assessments, fees, and charges, ' " and closing "government-devised loopholes." (*Apartment Ass'n*, at p. 837.)

Specifically, Proposition 218 added articles XIII C and XIII D to the California Constitution. Sections 4 and 5 of article XIII D relate to assessments levied by an agency on a parcel of property for a special benefit conferred upon that property. Section 4 sets forth requirements and procedures for such assessments. (Art. XIII D, § 4, subd. (a).) It provides, among other things, that "[n]o assessment shall be imposed on any parcel which exceeds the reasonable cost of the proportional special benefit conferred on that parcel." (*Ibid.*) It also requires that the agency send notice of the proposed assessment, with a ballot whereby owners may indicate their support or opposition to the proposed assessment. (*Id.*, subd. (d).) The

9

assessment cannot be imposed if, considering these ballots and all protests at a public hearing, a majority protest exists.  (*Id.*, subd. (e).)

Section 5 of article XIII D defines the effective date of Proposition 218 as "the day after the election unless otherwise provided" and specifies that beginning July 1, 1997, "all existing, new, or increased assessments" shall comply with the procedures and approval process set forth in section 4 of article XIII D, subject to certain enumerated exemptions.  One such exemption names assessments "existing on the effective date of this article" that were "imposed exclusively to finance the capital costs or maintenance and operation expenses for sidewalks, streets, sewers, water, flood control, drainage systems or vector control."  (Art. XIII D, § 5, subd. (a) ("art. XIII D, section 5(a)").)

Unlike these preceding sections regarding assessments that confer a special benefit on a parcel, section 6 of article XIII D sets forth requirements and procedures for property-related fees and charges imposed by an agency "upon any parcel or person as an incident of property ownership," including "user fees or charges for a property related service."  (Art. XIII D, § 6, subd. (b)(3); see also *id.* § 2, subd. (e) [defining " 'Fee' " or " 'charge' "].) Section 6(b) of article XIII D imposes a proportionality requirement:  "A fee or charge shall not be extended, imposed, or increased by any agency unless it meets all of the following requirements:  [¶] (1) Revenues derived from the fee or charge shall not exceed the funds required to provide the property related service.  [¶] (2) Revenues derived from the fee or charge shall not be used for any purpose other than that for which the fee or charge was imposed. [¶] (3) The amount of a fee or charge imposed upon any parcel or person as an incident of property ownership shall not exceed the proportional cost of the service attributable to the parcel."

10

And critically, section 6(c) of article XIII D imposes a voter approval process for all new or increased property-related fees and charges, subject to three exceptions: "Except for fees or charges for sewer, water, and refuse collection services, no property related fee or charge shall be imposed or increased unless and until that fee or charge is submitted and approved by a majority vote of the property owners of the property subject to the fee or charge or, at the option of the agency, by a two-thirds vote of the electorate residing in the affected area."

Proposition 218 also included an uncodified section expressly stating: "The provisions of this act shall be liberally construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent." (Ballot Pamp., Gen. Elec., *supra*, text of Prop. 218, § 5, p. 109.)

With this legal framework in mind, we turn to the parties' arguments regarding these constitutionally-imposed voter approval and proportionality requirements.

## B. Voter Approval Requirement

Plaintiffs argue the trial court erred in sustaining the demurrer on their first three causes of action because the stormwater services provided by City's combined sewer system are not "sewer" services under the exception to Proposition 218's voter approval requirement. The focus of this argument, in opposition to the demurrer and on appeal, is that City cannot contend otherwise by relying on Senate Bill No. 231's definition of "sewer" because that legislation is unconstitutional.

Typically, a litigant may challenge the constitutionality of a statute in two ways: on its face or as applied. "A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual." (*Tobe v.*

11

*City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 (*Tobe*).)  The law requires us to examine the "facial requirements" of the statute in order to determine whether its provisions " ' "inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." ' " (*Ibid.*, citing *Arcadia Unified School Dist. v. State Dept. of Education* (1992) 2 Cal.4th 251, 267.)

Unlike a facial challenge, an "as applied" challenge may seek "relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute or ordinance has been applied[.]" (*Tobe, supra*, 9 Cal.4th at p. 1084.)  An as applied challenge "contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the statute or ordinance has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right." (*Ibid.*)

Here, plaintiffs present an as applied challenge to Senate Bill No. 231: they argue its definition of "sewer" cannot be relied upon to interpret article XIII D, section 6(c)'s voter approval exception as inclusive of stormwater services provided by City's combined sewer system.  But City contends that, *even without application of Senate Bill No. 231*, the constitutional exception for "sewer" services is properly interpreted to include the stormwater services at issue here.

Given the as applied nature of plaintiffs' challenge and City's response to that challenge, we need not and do not address the general constitutionality of Senate Bill No. 231.[3]  Instead, the question before us is

---

[3]    We therefore deny plaintiffs' request for judicial notice of legislative history materials on Senate Bill No. 231 as not necessary or helpful to our

12

whether City's combined sewer system provides "sewer" services excepted from Proposition 218's voter approval requirement.

"When construing a constitutional provision enacted by initiative, the intent of the voters is the paramount consideration." (*Davis v. City of Berkeley* (1990) 51 Cal.3d 227, 234.) We begin with the plain language of the provision, "which is typically the best and most reliable indicator of purpose." (*California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 933.) "We start by ascribing to words their ordinary meaning, while taking account of related provisions and the structure of the relevant statutory and constitutional scheme." (*Ibid.*) Where possible, we avoid " 'literalism that effects absurd, arbitrary, or unintended results.' " (*Richmond v. Shasta Community Services Dist.* (2004) 32 Cal.4th 409, 419 (*Richmond*).) "Terms used in a constitutional amendment 'must be construed in the light of their meaning at the time of the adoption of the amendment.' " (*Forster Shipbuilding Co. v. County of Los Angeles* (1960) 54 Cal.2d 450, 456.) "If the provisions' intended purpose nonetheless remains opaque, we may consider extrinsic sources, such as an initiative's ballot materials." (*California Cannabis Coalition*, at pp. 933–934.)

### 1. Meaning of "Sewer"

The term "sewer" is not defined in article XIII D, section 6(c), or in any other constitutional provision added by Proposition 218. Indeed, none of the three voter approval exceptions ("sewer, water, and refuse collection

---

analysis. (Cal. Rules of Court, rule 8.252; *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6.) For the same reasons, we also deny the request by various amici curiae for judicial notice of California Regional Water Quality Control Board San Francisco Bay Region order excerpts, Executive Order No. N-10-19, and California Water Resilience Portfolio excerpts, which were offered to illustrate public policy considerations relevant to Senate Bill No. 231.

services") was defined by the measure. (Ballot Pamp., Gen. Elec., *supra*, text of Prop. 218, § 5, p. 109.)

Given the absence of such constitutional definitions, California courts have looked to statutory definitions existing at the time Proposition 218 was passed to interpret the terms in article XIII D, section 6(c). In *Crawley v. Alameda County Waste Management Authority* (2015) 243 Cal.App.4th 396 (*Crawley*), for example, the plaintiff had challenged a property charge for the disposal of household hazardous waste. (*Id.* at p. 400.) The plaintiff argued that such waste was not "refuse" covered by the "refuse collection" services exception to voter approval under Proposition 218. (*Id.* at p. 409.) The appellate court disagreed, citing the definition of "refuse" in Health and Safety Code section 4740 that included " '*anything thrown away as worthless*.' " (*Crawley*, at p. 410.) *Crawley* explained: "It is inherent in the act of disposing of or depositing household hazardous waste for collection that the household hazardous waste is no longer of value to the property owner." (*Ibid.*) The court also noted its interpretation was consistent with the plain meaning of the terms "refuse" and "garbage" in other statutes and dictionaries. (*Ibid.*)

Adopting this approach, we find Public Utilities Code section 230.5 instructive here. Enacted in 1970, this section defines the term "sewer system" expansively to include "all real estate, fixtures, and personal property owned, controlled, operated, or managed in connection with or to facilitate sewage collection, treatment, or disposition for sanitary or drainage purposes, including any and all lateral and connecting sewers, interceptors, trunk and outfall lines and sanitary sewage treatment or disposal plants or works, and any and all drains, conduits, and outlets for surface or storm waters, and any and all other works, property or structures necessary or

14

convenient for the collection or disposal of sewage, industrial waste, or surface or storm waters." (Pub. Util. Code, § 230.5, added by Stats. 1970, ch. 1109, § 2.) Under this longstanding definition, City's combined wastewater and stormwater system is clearly a "sewer."[4]

We acknowledge there are other statutes that appear to address wastewater (sewerage) and stormwater systems as separate systems. But viewed in context, such statutes do not suggest that a combined system is not a sewer system. Health and Safety Code section 5471, for example, initially provided authority for an entity to prescribe, revise, and collect fees for services and facilities furnished in connection with its sewerage system. (*Id.*, subd. (a).) Five years before Proposition 218 was adopted, the final phrase of that provision was amended to authorize such fees "in connection with its water, sanitation, storm drainage, or sewerage system." (Stats. 1991, ch. 1110, § 35.) Legislative history materials explain the purpose of this amendment was to ensure that newer cities could impose such fees for their "storm drainage systems." (Sen. L. Gov. Com., Off. of Sen. Floor Analyses, 3d

---

[4] The Association of California Water Agencies, California State Association of Counties, and League of California Cities jointly filed an amicus curiae brief pointing to the way sewer systems are defined under regulations implementing the Clean Water Act (33 U.S.C. § 1251 et seq.). (E.g., 40 C.F.R. § 35.2005(11) [defining "combined sewer" as "[a] sewer that is designed as a sanitary sewer and a storm sewer"]; *id.*, § 35.2005(37) [defining "Sanitary sewer" as "[a] conduit intended to carry liquid and water-carried wastes from residences, commercial buildings, industrial plants and institutions together with minor quantities of ground, storm and surface waters that are not admitted intentionally"]; *id.*, § 35.2005(48) [defining "Storm sewer" as "[a] sewer designed to carry only storm waters, surface run-off, street wash waters, and drainage"].) These federal regulations, which were issued in 1984 (49 Fed.Reg. 6234 (Feb. 17, 1984)), recognize that a single sewer system—i.e., a "combined sewer"—can handle both wastewater and stormwater.

15

reading analysis of Sen. Bill No. 682 (1991–1992 Reg. Sess.) as amended Sept. 9, 1991, p. 2.)  Accordingly, we do not view Health and Safety Code section 5471 as reflecting a general understanding that a sewer system can never combine sewerage and storm drainage functions; rather, it seems to reflect the apparent reality in 1991 that public entities often constructed and maintained separate sewerage and storm drainage systems.

Similarly, Government Code section 63010 provides a definition of "Public development facilities" under the Bergeson-Peace Infrastructure and Economic Development Bank Act (§§ 63000 et seq.).  This definition specifies various services provided by such facilities, including "Drainage, water supply, and flood control" and "Sewage collection and treatment."  (§ 63010, subds. (q)(3), (10).)  Though section 63010 does not purport to provide a statutory definition for either phrase, it states "Drainage, water supply, and flood control" includes "storm sewers."  (*Id.*, subds. (q)(3).)  Like Health and Safety Code section 5471, the reference to "storm sewers" appears directed at separate stormwater systems.  And again, neither statute negates the definition in Public Utilities Code section 230.5 that a *combined* wastewater and stormwater system, like the one at issue here, is a "sewer" system.

## 2. Dictionary Definitions

Dictionary definitions of the term "sewer" around the time of Proposition 218 also recognize and include combined sewer systems. Webster's dictionary defined "sewer" as "a ditch or surface drain" or "an artificial usually subterranean conduit to carry off water and waste matter (as surface water from rainfall, household waste from sinks or baths, or waste water from industrial works)."  (Webster's Third New International Dictionary (1993) p. 2081.)  And the Oxford English dictionary defined "sewer" as an "artificial watercourse for draining marshy land and carrying

16

off surface water into a river or the sea" and an "artificial channel or conduit, now usually covered and underground, for carrying off and discharging waste water and the refuse from houses and towns."  (Oxford English Dict. (2d ed. 1989, vol. XV) p. 105.)  Under these definitions, the term "sewer" includes a combined wastewater and stormwater sewer.

Though general dictionaries may be helpful to consult, we are mindful that " 'great caution' " must be exercised when consulting a dictionary definition of a common term to determine the meaning of a constitutional or statutory provision.  (*A.S. v. Miller* (2019) 34 Cal.App.5th 284, 293, fn. 4.)  Indeed, a dictionary " ' "is a museum of words, an historical catalog rather than a means to decode the work of legislatures" ' " and voters.  (*Ibid*.; see *De Vries v. Regents of University of California* (2016) 6 Cal.App.5th 574, 591.)  Here, we simply note that construing the term "sewer" in article XIII D, section 6(c) as inclusive of combined sewer systems is both reasonable and justifiable.

### 3.  *Decisional Law*

Our interpretation is also consistent with other California appellate court decisions addressing Proposition 218.  In *Griffith v. Pajaro Valley Water Management Agency* (2013) 220 Cal.App.4th 586 (*Griffith*), for example, the agency was tasked with resolving issues related to water in its jurisdiction being extracted faster than it was replenished naturally, leading to saltwater intrusion from the coast into the groundwater.  (*Id.* at p. 590, disapproved on other grounds in *City of San Buenaventura v. United Water Conservation Dist.* (2017) 3 Cal. 5th 1191, 1211, fn. 6.)  The agency sought to reduce the amount of water taken from the groundwater basin (e.g., from wells), by supplying supplemental water to some users.  (*Griffith*, at p. 590.)  To do so, it enacted an ordinance increasing groundwater augmentation charges for

17

the operation of wells and the " 'purchase/acquisition, capture, storage and distribution of supplemental water.' " (*Id.* at pp. 589–591.)

The plaintiffs challenged the ordinance as violating Proposition 218. (*Griffith*, *supra*, 220 Cal.App.4th at p. 591.) As relevant here, the plaintiffs argued the agency's ordinance did not implicate "water" services covered by the voter approval exception in article XIII D, section 6(c). (*Griffith*, at p. 595.) In rejecting that argument, the *Griffith* court reached a conclusion somewhat analogous to ours, i.e., that charges for water delivery and water extraction are "akin" to each other, and that both services fall within the broader concept of a "water" system. (*Ibid.*)

Similarly, in *Capistrano Taxpayers Assn., Inc. v. City of San Juan Capistrano* (2015) 235 Cal.App.4th 1493 (*Capistrano*), the city had set a rate structure imposing charges for recycling water. (*Id.* at p. 1501.) But while some users could receive the non-potable recycled water, others including private residences could not because they were not plumbed for such use. (*Ibid.*) The trial court determined the city had violated the requirement in article XIII D, section 6(b)(4) that charges be imposed for services " 'actually used by, or immediately available to, the owner of the property in question.' " (*Capistrano*, at p. 1501.) The appellate court disagreed, rejecting the assumption that "providing recycled water is a fundamentally different kind of service from providing traditional potable water." (*Id.* at p. 1502.) It explained: "When each kind of water is provided by a single local agency that provides water to different kinds of users, some of whom can make use of recycled water (for example, cities irrigating park land) while others, such as private residences, can only make use of traditional potable water, providing each kind of water is providing the *same* service." (*Ibid.*) The appellate court

18

further reasoned that water is "part of a holistic distribution system that does not distinguish between potable and nonpotable water." (*Ibid.*)

The lesson we draw from *Griffith* and *Capistrano* is that the terms used in article XIII D do not represent rigidly defined services and functions that cannot overlap or be combined with others. Here, City provides wastewater and stormwater services within the same sewer system. Once the flows enter that system, there appears no indication they are treated differently. Plaintiffs offer no legal or logical basis for interpreting the term "sewer" in article XIII D, section 6(c) as applicable to only one part of this "holistic" sewer system.[5] (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1502.)

Plaintiffs rely on *Howard Jarvis Taxpayers Association v. City of Salinas* (2002) 98 Cal.App.4th 1351 (*City of Salinas*) and *Department of Finance v. Commission on State Mandates* (2022) 85 Cal.App.5th 535 (*Department of Finance*) to argue otherwise. But both cases are distinguishable because, unlike City's combined sewer system here, *separate* stormwater systems were at issue.

In *City of Salinas*, the plaintiffs challenged a property-related fee imposed by the city council to reduce or eliminate pollutants in stormwater.

---

[5]     At oral argument, plaintiffs seemed to suggest that, under *Griffith* and *Capistrano*, City's stormwater services must provide a common benefit to its sewer users and/or its wastewater services in order to qualify for the voter approval exception under article XIII D, section 6(c). True, both courts cited the common benefit to users in determining that supplemental and recycled water services are "immediately available" to owners paying the respective charges under article XIII D, section 6(b)(4). (*Griffith*, *supra*, 220 Cal.App.4th at p. 602; *Capistrano*, *supra*, 235 Cal.App.4th at p. 1502.) But plaintiffs offer nothing to support the questionable proposition that stormwater services do not benefit sewer users, and neither *Griffith* nor *Capistrano* imposed a benefit requirement *between* services within a combined system for purposes of article XIII D, section 6(c).

19

(*City of Salinas*, *supra*, 98 Cal.App.4th at p. 1353.) There, as here, the plaintiffs argued the fee violated article XIII D, section 6(c) because it had not been approved by a majority vote of affected property owners. (*City of Salinas*, at p. 1354.) But Salinas had a stormwater drainage system that was separate and distinct from its sanitary and industrial waste systems (*id*. at p. 1353), so the question in *City of Salinas* was whether the voter approval exception for "sewer" services extended to Salinas's separate stormwater drainage system. (*Id*. at p. 1356.)

*City of Salinas* concluded "the term 'sewer services' is ambiguous in the context of both section 6(c) and Proposition 218 as a whole." (*City of Salinas*, *supra*, 98 Cal.App.4th at p. 1357.) After reviewing statutory and dictionary references to sewer services, the court ultimately determined that "[t]he popular, nontechnical sense of sewer service, particularly when placed next to 'water' and 'refuse collection' services, suggests the service familiar to most households and businesses, the sanitary sewerage system." (*Ibid*.) Mindful of "the voters' intent that the constitutional provision be construed liberally to curb the rise in 'excessive' taxes, assessments, and fees exacted by local governments without taxpayer consent [citation]," the court felt "compelled to resort to the principle that exceptions to a general rule of an enactment must be strictly construed" and to thus interpret "sewer" services as not inclusive of Salinas's separate storm drainage system. (*Id*. at pp. 1357–1358.) Accordingly, the court held that article XIII D, section 6(c) required Salinas to subject its stormwater drainage system fee to a vote by the property owners or the voting residents of the affected area. (*City of Salinas*, at pp. 1358–1359.)

Importantly, however, the *City of Salinas* court emphasized the separate nature and purpose of the storm drainage system at issue there. In

20

concluding that voter approval was required for that system, the court reasoned: "The City itself treats storm drainage differently from its other sewer systems. The stated purpose of ordinance No. 2350 was to comply with federal law by reducing the amount of pollutants discharged into the storm water, and by preventing the discharge of 'non-storm water' into the storm drainage system, which channels storm water into state waterways. According to John Fair, the public works director, the City's storm drainage fee was to be used not just to provide drainage service to property owners, but to monitor and control pollutants that might enter the storm water before it is discharged into natural bodies of water. The Salinas City Code contains requirements addressed specifically to the management of storm water runoff." (*City of Salinas*, *supra*, 98 Cal.App.4th at p. 1358.)

*City of Salinas*'s conclusion that voter approval was necessary for the separate stormwater system charges in that case does not compel the same conclusion for City's combined sewer system. Plaintiffs offer no authority suggesting the principle regarding the strict construction of exceptions or Proposition 218's liberal construction clause are properly invoked to exclude part of the combined sewer system that City employs to collect and treat both wastewater and stormwater. Put another way, the voter approval exception in article XIII D, section 6(c) is properly applied to "those circumstances which are within the words and reason of the exception." (*City of Lafayette v. East Bay Mun. Utility Dist.* (1993) 16 Cal.App.4th 1005, 1017.) That City's sewer service is combined does not mean it is not a sewer service.

*Department of Finance*, *supra*, 85 Cal.App.5th 535, also involved a separate storm sewer system. In that case, the San Diego regional board of the California Regional Water Quality Control Board had issued permits to local governments for the operation of this separate system. (*Id*. at p. 551.)

21

The permittees filed a test claim with the Commission on State Mandates (Commission) seeking subvention of funds to compensate for the costs of complying with new permit requirements. (*Id.* at p. 552; see art. XIII B, § 6, subd. (a) [allowing reimbursement of local governments for costs of a "new program or higher level of service" mandated by a state agency, except where such costs are recoverable from sources other than taxes].)

Relying on the holding in *City of Salinas* regarding its stormwater drainage system fee, the Commission concluded the majority of the new permit requirements were reimbursable mandates because permittees had no authority to levy fees for stormwater drainage systems without voter approval under Proposition 218. (*Department of Finance*, *supra*, 85 Cal.App.5th at pp. 560–561.) In determining that reimbursement was appropriate, the Commission reasoned that a contrary holding would defeat the purpose of subvention because the voters might never approve the proposed stormwater fees. (*Id.* at pp. 562–563.) The Commission issued its ruling in 2010. (*Id.* at p. 552.)

After the trial court upheld the Commission's decision, the appellate court was tasked with interpreting the term "sewer" in article XIII D, section 6(c), at the time of the Commission's decision before Senate Bill 231 was passed, and whether it encompassed a separate stormwater drainage system. (*Department of Finance*, *supra*, 85 Cal.App.5th at p. 565.) Acknowledging that dictionary definitions of the term sewer "indicate the word can refer to both sanitary sewers and storm drainage systems," the court nonetheless found they were not dispositive of the issue. (*Id.* at p. 567.) But unlike the court in *City of Salinas*, the *Department of Finance* court looked to article XIII D, section 5(a), "in which the voters distinguished the word 'sewer' from a drainage system" for purposes of exempting assessments from certain

procedures and approval requirements if they were in existence on July 1, 1997 and had been imposed exclusively to finance the capital or operational costs for " 'sidewalks, streets, *sewers*, water, flood control, *drainage systems* or vector control.' "  (*Department of Finance*, at pp. 567–568.)

The *Department of Finance* court viewed article XIII D, section 5(a)'s separate references to "sewers" *and* "drainage systems" as evidence that California voters "intended the words to have different meanings." (*Department of Finance*, *supra*, 85 Cal.App.5th at p. 568.)  "Were it not so," reasoned the court, "the use of the terms to convey the same meaning would render them superfluous, an interpretation courts are to avoid."  (*Ibid*.)  In light of the separate references used in article XIII D, section 5(a), the court concluded the voters did not intend the "sewer" exception in article XIII D, section 6(c), to include fees for separate stormwater drainage systems. (*Department of Finance*, at p. 568.)

Like *City of Salinas*, *Department of Finance* is distinguishable because it involved a separate stormwater drainage system.[6]  And like Health and Safety Code section 5471 and Government Code section 63010, the inclusion of the term "drainage systems" in article XIII D, section 5(a)'s exemption for existing assessments does nothing to define section 6(c)'s exception for sewer services as excluding a combined sewer system like the one City operates here.

### 4.  *Avoiding an Unintended Result*

Finally, we are not persuaded that voters intended the term "sewer" in article XIII D, section 6(c) to apply to only *part* of a combined sewer system.

---

[6]     We need not and do not express an opinion on the holdings of *City of Salinas* and *Department of Finance* as they relate to separate stormwater systems.

The existence of combined sewer systems—in San Francisco and elsewhere—appeared in case law long before Proposition 218. (See, e.g., *Edward Brown & Sons*, *supra*, 36 Cal.2d at p. 274; *County of Riverside v. Whitlock* (1972) 22 Cal.App.3d 863, 874, fn. 9 [referencing public improvements to "storm and sanitary sewers"], *Ramseier v. Oakley Sanitary Dist.* (1961) 197 Cal.App.2d 722, 723 [discussing district's "storm and sanitary sewer system"].)

As indicated, plaintiffs are in full agreement that charges for wastewater sewer services are not subject to voter approval under article XIII D, section 6(c). But they offer no legal or logical basis for supposing that the voters who approved Proposition 218 intended to force every public entity operating a combined sewer system in California to segregate charges for services attributable to wastewater from those attributable to stormwater. Nor do plaintiffs point to anything suggesting segregation was reasonable or even possible at that time. Indeed, even assuming currently-developing technology is making it possible to calculate the charges separately attributable to wastewater and stormwater, subjecting stormwater charges to voter approval may result in the degradation of a combined sewer system as a whole when approval is withheld. We are reluctant to construe the voter approval exception in article XIII, section 6(c), as excluding a system providing combined sewer services when indulging in such an interpretation finds no support in the constitutional language and may potentially effect such an unintended result. (*Richmond*, *supra*, 32 Cal.4th at p. 419 [construing article XIII D's definition of assessment as applying to only certain charges because of the inherent impossibility of identifying in advance all charges which might apply].)

Because the City's combined sewer system provides "sewer" services excepted from the voter approval requirement in article XIII D, section 6(c),

24

the trial court did not err in sustaining City's demurrer on plaintiffs' first, second, and third causes of action.

Nor did the court err in denying leave to amend these three claims. When a demurrer is sustained without leave, "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) "The burden of proving such reasonable possibility is squarely on the plaintiff." (*Ibid.*) Here, the only amendment plaintiffs propose to add are allegations that Senate Bill No. 231 is unconstitutional. Because the defect in the first, second, and third causes of action is apparent without addressing the perceived unconstitutionality of that legislation, leave to amend these claims was properly denied.

### C. Proportionality Requirement

Plaintiffs' fourth cause of action alleges City's charges—under the prior rate structure and while the new structure is being "phased in"—violate the proportionality requirement of Proposition 218. To reiterate, article XIII D, section 6(b)(3) requires that property-based charges "imposed upon any parcel or person as an incident of property ownership shall not exceed the proportional cost of the service attributable to the parcel." Plaintiffs allege City violated this requirement because its charges were based only on wastewater cost factors (e.g., flow and strength), and not also on stormwater cost factors (e.g., impermeable surface area).

Plaintiffs argue the trial court erred in sustaining City's demurrer on this claim because it is sufficiently stated to proceed beyond the pleading stage. In making such a determination, we accept as true all material facts properly pleaded, but "not contentions, deductions or conclusions of fact or

25

law." (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.) Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. (*Ibid.*)

The premise of City's demurrer on this fourth cause of action is the same as the preceding three claims: that because stormwater services are "sewer" services within City's combined system under article XIII D, section 6(c), it had no obligation to apportion stormwater costs and wastewater costs. City argues that this "dooms" the fourth cause of action because plaintiffs have not challenged City's overall sewer rates, but instead only its stormwater charges.

We reject this characterization of plaintiffs' proportionality claim. The complaint alleges that City's *sewer rates* violate article XIII D, section 6(c) because the rates under the prior structure and phasing in of the new structure are based only on wastewater cost factors with no consideration of costs attributable to stormwater factors. Because plaintiffs allege that the costs attributable to wastewater factors and to stormwater factors differ in criteria and calculation, which is consistent with SFPUC's 2018 and 2023 reports submitted on demurrer, we conclude the complaint adequately alleges disproportionality of City's sewer rates.

Nor are we persuaded that City's argument defeats this proportionality claim *as a matter of law*. City assumes that its stormwater charges are proportional because they were calculated using wastewater factors and, as explained above, City's combined system provides "sewer" services under Proposition 218's voter approval exception. But City offers no authority supporting its position that if services fall within the same exception of article XIII D, section 6(c), they can be used interchangeably to satisfy the

26

proportionality requirement in article XIII D, section 6(b)(3).  And the cases they do cite are inapposite.

In *Morgan v. Imperial Irrigation District* (2014) 223 Cal.App.4th 892 (*Morgan*), the plaintiffs alleged the district's cost of service study for new water rates did not prove proportionality because the underlying data was poor and not reviewed or audited.  (*Id.* at p. 915.)  *Morgan* determined article XIII D, section 6 "does not require perfection" in data, and it found sufficient evidence of data reliability to support judgment for the district.  (*Morgan*, at p. 918.)  And in *Capistrano*, the plaintiffs challenged a new water rate structure that used four distinct "tiers" of pricing.  (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1499.)  Though concluding that tiered rates are generally consistent with the proportionality requirement of article XIII D, section 6(b)(3), *Capistrano* determined the city had failed to satisfy this requirement.  Specifically, the city "did not try to calculate the incremental cost of providing water at the level of use represented by each tier," and "tiers must still correspond to the actual cost of providing service at a given level of usage."  (*Capistrano*, at pp. 1498–1499; cf. *Griffith*, *supra*, 220 Cal.App.4th at p. 601 [rejecting contention that Proposition 218 "compels a parcel-by-parcel proportionality analysis" instead of "grouping similar users together"].)

Unlike the situations in *Morgan*, *Capistrano*, and *Griffith*, plaintiffs here do not challenge the reliability of City's data or its use of customer tiers or grouping.  Instead, plaintiffs allege that City's reliance on wastewater factors *alone* to support sewer rates that recover costs for stormwater services violates the proportionality requirement.

*Coziahr v. Otay Water Dist.* (2024) 103 Cal.App.5th 785 (*Coziahr*) is instructive.  In that case, the plaintiff alleged the district's water rates were not proportional because they did not correspond to the actual cost of water

27

service to customer parcels. (*Id.* at p. 792.) The trial court ruled in the plaintiff's favor after determining the district's rate structure relied on " 'non-cost' " factors to promote water conservation that resulted in differential treatment of customers. (*Id.* at p. 807.) The appellate court affirmed, concluding the rate structure rested on "nonspecific data," assumptions, and industry standards, rather than "the actual cost of providing water service to the parcel." (*Id.* at pp. 808, 812.) In a passage that speaks to the matter here, *Coziahr* explained: "[T]he California Supreme Court has made clear the proportionality requirement under section 6(b)(3) demands something *more* than the reasonable basis standard under article XIII A. To satisfy Section 6(b)(3), then, it is not enough for a water agency to show it uses a reasonable allocation method. Rather, an agency must show that the method produces rates that are proportional to costs." (*Coziahr*, at p. 801.)

The question presented by plaintiffs' fourth cause of action is whether City's sole reliance on wastewater factors to support sewer rates that recover costs for both wastewater and stormwater services satisfies this threshold. This presents a factual question that is inappropriate for resolution on demurrer. (See *KCSFV I, LLC v. Florin County Water Dist.* (2021) 64 Cal.App.5th 1015, 1030 ["agency must generally provide evidence identifying the data used, analyzing the cost of service, and demonstrating the proportionality" of a challenged rate increase].) At the very least, SFPUC's 2018 and 2023 reports suggest it had historically recovered sewer charges based on wastewater cost factors because of difficult challenges in identifying and/or isolating stormwater costs, not because of any conclusive authority that such practices satisfied Proposition 218's proportionality requirement. Now having the ability to do so, SFPUC has proposed that separate stormwater charges will "enhance the equity in its rate structure." Indeed,

28

SFPUC anticipated that separate stormwater charges would have "significant bill impacts" for certain customers, and thus decided that implementation of the new rate structure "should take place over a few years instead of all at once."

In sum, we conclude the trial court erred in sustaining City's demurrer to plaintiffs' fourth cause of action. Having so concluded, we need not and do not address the parties' arguments regarding leave to amend the fourth cause of action. And because the demurrer and the trial court's ruling on plaintiffs' fifth cause of action for declaratory relief were based entirely on the perceived failures of the preceding four causes of action, we conclude the court also erred in sustaining the demurrer on this cause of action to the extent it seeks declaratory relief related to plaintiffs' proportionality claim.

## DISPOSITION

The judgment is reversed as to plaintiff's fourth and fifth causes of action. In all other respects, it is affirmed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)

_____
Fujisaki, J.

WE CONCUR:


_____
Tucher, P.J.


_____
Rodríguez, J.

29

Trial Court:      City & County San Francisco Superior Court

Trial Judge:     Hon. Rochelle C. East

Counsel:         Law Office of Amy Sparrow, Amy C. Sparrow; COHELAN
                 KHOURY & SINGER, and Michael D. Singer for
                 Plaintiffs and Appellants

                 David Chiu, City Attorney, Alexander J. Holtzman and
                 Sara J. Eisenberg, Deputy City Attorneys for Defendant
                 and Respondent.

*Gluck v. City and County of San Francisco* (A170087)